# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### 2016 MSPB 2

Docket No. DC-0752-16-0278-I-1

**Naval Station Norfolk – Hearing 2,**

**Appellants,**

**v.**

**Department of the Navy,**

**Agency.**

January 13, 2016

Neil C. Bonney, Esquire, Virginia Beach, Virginia, for the appellants.

Julia Alexandra Fitzmaurice and Brent Fraim, Norfolk, Virginia, for the agency.

### BEFORE

Susan Tsui Grundmann, Chairman
Mark A. Robbins, Member

### OPINION AND ORDER

¶1 The appellants have petitioned for review of initial decisions that affirmed the agency's furlough actions. Because these appeals present similar issues, and to expedite their processing, we CONSOLIDATE them pursuant to 5 U.S.C. § 7701(f)(1) and 5 C.F.R. § 1201.36(a)-(b).[1] For the following reasons, we GRANT the petitions for review, FIND that the appellants were subject to, and not excepted from, the furlough, AFFIRM the initial decisions' determinations

---

[1] The appeals that are included in this consolidation are *Sharon Gaston v. Department of the Navy*, MSPB Docket No. DC-0752-14-0532-I-1, and *Frederick W. Greenfield v. Department of the Navy*, MSPB Docket No. DC-0752-14-0533-I-1.

that the furlough promoted the efficiency of the service, VACATE the initial decisions' findings on the appellants' discrimination claims, and REMAND the appeals for further adjudication consistent with this Opinion and Order.

BACKGROUND

¶2   The agency furloughed the appellants for 6 days from their GS-0083-8 Detective positions at the Naval Station Norfolk (NSN). *Greenfield v. Department of the Navy*, MSPB Docket No. DC-0752-14-0533-I-1, Initial Appeal File (IAF), Tab 6 at 7, 24, 26, 28, 30-32.[2]   The agency informed the appellants that the furlough was necessitated by the extraordinary and serious budgetary challenges facing the Department of Defense (DOD) for the remainder of fiscal year 2013, the most serious of which was the sequester that began on March 1, 2013, i.e., across-the-board reductions to budgetary resources for the Federal Government. *Id*. at 38.   The agency also informed the appellants that, if other employees in their competitive level (i.e., positions at the same grade level and classification series, the duties of which were generally interchangeable) were not being furloughed, it was because those employees, among other things, were in a position "whose duties have been determined to be of crucial importance to this agency's mission and responsibilities and cannot be curtailed." *Id*.

¶3   On appeal to the Board, the appellants asserted that the agency improperly subjected them to a furlough and discriminated against them based on their race (Black).[3]   IAF, Tab 1 at 4, Tab 8 at 6, 22.   In an equal employment opportunity complaint, for example, the appellants asserted that the agency did not furlough the GS-0083 Detectives at other installations in the Mid-Atlantic Region (Little

---

[2] All of the citations to the record are to the file of the appellant Greenfield unless otherwise specified.

[3] The appellant Gaston also alleged that the action was based on sex discrimination. *Gaston v. Department of the Navy*, MSPB Docket No. DC-0752-14-0532-I-1, Initial Appeal File (Gaston IAF), Tab 13.

Creek, Oceana, and Norfolk Naval Shipyard), all of whom were White or Hispanic.  IAF, Tab 8 at 7.

¶4	After conducting a single hearing for both appeals, the administrative judge affirmed the furlough actions in two separate initial decisions.  IAF, Tab 25, Initial Decision (ID) at 21; *Gaston v. Department of the Navy*, MSPB Docket No. DC-0752-14-0532-I-1, Initial Appeal File (Gaston IAF), Tab 34, Initial Decision (Gaston ID).  The administrative judge found that the agency established cause for the furlough—a shortage of funds—and that the furlough promoted the efficiency of the service.  ID at 5.  The administrative judge further found that the appellants did not prove that the agency treated them differently from similarly situated employees.  ID at 16.  In this regard, the administrative judge held that the police officers and detectives at Little Creek, Oceana, and Norfolk Naval Shipyard were not similarly situated to the appellants because they were part of different organizational units and different competitive areas for purposes of the furlough.  ID at 17.  Likewise, the administrative judge found that the appellants were not similarly situated to the classification series 0083 Police Officers at the NSN who were not furloughed because they were not, like the police officers, first responders charged with direct responsibility for protecting the safety of life and property.  ID at 18-19.  The administrative judge noted that, although the appellants performed first-responder-like duties on occasion, their jobs as detectives were uniquely different from the position of police officer because only detectives process crime scenes in preparation for investigations.  ID at 18.

¶5	The administrative judge also determined that the appellants did not prove that the decision to furlough them was motivated by race or sex.  ID at 17; Gaston ID at 20.  The administrative judge held that, although the NSN Security Officer, who the administrative judge found was also the proposing official, used "offensive, despicable, and racist language" when referring to various employees of color within the security department, the evidence did not establish that the proposing official influenced the deciding official's decision not to except the

appellants from the furlough. ID at 13, 17-18, 20. The administrative judge found that the deciding official's explanation that race played no role in his decision was credible, particularly given his undisputed testimony that he did not know the race of the appellants before deciding to furlough them. ID at 19. In addition, given that the deciding official furloughed 3,200 individuals, the administrative judge found it inherently improbable that his decision not to except the appellants from the furlough was personal to them. *Id*.

¶6    The administrative judge concluded that the agency articulated legitimate management reasons for its decision to except NSN police officers, but not the appellants, and that there was no evidence that the agency manipulated the exceptions to target the appellants for personal reasons. ID at 20. Thus, the administrative judge held that the agency proved by preponderant evidence that it furloughed its employees in a fair and even manner. *Id*.

## ANALYSIS

<u>The agency proved by preponderant evidence that the appellants met the criteria for being subject to, and not excepted from, the furlough.</u>

¶7    The appellants contend on review that, as detectives, they met the categorical exception from the furlough for employees having direct responsibility to protect the safety of life and property. *Greenfield v. Department of the Navy*, MSPB Docket No. DC-0752-14-0533-I-1, Petition for Review (PFR) File, Tab 1 at 4, 10, 14-15.[4] In this regard, the appellants assert that, although the agency apparently decided not to except them from the furlough because detectives are not "first responders," the actual exception criteria was "direct responsibility to protect the safety of life and property," not "first responders." *Id*. at 11. They also contend that detectives are more likely to respond to the

---

[4] The appellants' representative filed a petition for review on behalf of each appellant. The petitions are largely identical; thus, unless noted otherwise, citations to the petition for review are to the petition filed in the appellant Greenfield's case.

safety of life and property because criminals have fled the scene by the time police officers respond to most crime scenes, detectives serve as first responders when they are patrolling or working undercover, or during stakeouts, and several witnesses testified, without competent rebuttal, that detectives are first responders. *Id*. at 11-12.

¶8        Under 5 U.S.C. §§ 7512(5) and 7513(a), an agency may furlough an employee for 30 days or less "only for such cause as will promote the efficiency of the service."   Before the Board reaches the issue of whether an action promotes the efficiency of the service, an agency must first establish that there is "cause" under 5 U.S.C. § 7513(a).  *Dye v. Department of the Army*, 121 M.S.P.R. 142, ¶ 9 (2014).   The concept of "cause" in the context of a furlough appeal encompasses whether the appellant met the criteria established by the agency for being subject to, and not excepted from, the furlough.  *Id*.  The agency has the burden of proving "cause" by preponderant evidence.  *See Tinker AFSC/DP v. Department of the Air Force*, 121 M.S.P.R. 385, ¶ 15 (2014); *Dye*, 121 M.S.P.R. 142, ¶ 10.

¶9        In a May 14, 2013 memorandum, the Secretary of Defense set forth a list of DOD furlough exceptions, which included the following:  "In order to avoid harm to mission, those employees necessary to protect safety of life and property are excepted to the extent necessary to protect life and property."  *Naval Station Norfolk – Hearing v. Department of the Navy*, MSPB Docket No. DC-0752-14-0669-I-1, Consolidation Appeal File (CAF), Tab 2[5]; Department of the Navy Administrative Record for FY 2013 Furlough Appeals (AR), Part 1 at 105, 108, *available at* http://www.mspb.gov/furloughappeals/navy2013.htm.   The

---

[5] These appeals were previous part of a separate consolidation, *Naval Station Norfolk – Hearing v. Department of the Navy*, MSPB Docket No. DC-0752-14-0669-I-1; however, these appeals were severed from that consolidation prior to hearing and the issuance of the initial decisions.

memorandum further provided that "[t]he exceptions approved for the safety of life and protection of property category are granted with the understanding that these are the minimum exceptions needed to maintain operations and provide security on a 24/7 basis and that furloughing these employees would result in the Department incurring additional costs for premium pay." AR, Part 1 at 109. In a declaration made under penalty of perjury, the Principal Deputy Assistant Secretary of the Navy (Manpower and Reserve Affairs) indicated that the exception was intended to be limited in application, and that Budget Submitting Offices were "instructed to identify positions where 80% manning would create unacceptable risk," and this "focused on 24/7 shifts and emergency response requirements." *Id*. at 12, 14. Planning guidance issued on February 21, 2013, by the Under Secretary of the Navy indicated that one of the exceptions to the furlough would be for "[c]ivilians directly responsible for safety of life or property—only to the extent needed to prevent unacceptable risk or catastrophic gaps in the safety and protection of life or property." IAF, Tab 9 at 68-69.

¶10 The Board addressed this categorical furlough exception in *Lopez v. Department of the Navy*, 121 M.S.P.R. 647, ¶ 11 (2014), finding that it provided an exception from the furlough for those employees who occupied positions that generally were necessary to protect life and property, but only to the extent that it was necessary for such employees to protect life and property. The Board found that this exception did not necessarily create a blanket exception for all employees occupying such positions regardless of whether their exception was necessary to protect life and property. *Id*. Thus, this exception contemplated the possibility that employees occupying positions that generally are necessary to protect life and property could be excepted for only a portion of a planned furlough, or that some employees occupying positions that generally are necessary to protect life and property could be excepted while others would not be excepted. *Id*.

¶11    Here, the NSN Security Officer indicated in an affidavit that he interpreted the guidance to mean that uniformed police officers who stand at the gate were excepted, so he decided not to recommend the exception of such employees as canine handlers, administrative staff, "pass/ID" officers, training staff, and detectives.  IAF, Tab 8 at 102.  He averred that, if a civilian was not directly responsible for the safety of life or property, an exception for that civilian had to be justified.  *Id*. at 103.  The Security Officer further indicated that detectives do not manage traffic or contribute to counterterrorism efforts, but instead manage a case load, which they work at their own pace; thus, if a detective did not show up to work, public safety could be kept intact.  *Id*. at 105-06.  By contrast, if there were not enough police officers, the base would have to close because the public would be at risk.  *Id*.  Similarly, the Security Officer testified that, based on guidance from the Under Secretary of the Navy, he and several other officials, after considering where they could take acceptable risks to protect the installation, determined that it would not be an acceptable risk to furlough uniformed police officers who are first responders.  IAF, Tab 24, Hearing Compact Disc (HCD) 1.  He testified that they would, however, subject to the furlough administrative office staff, police trainers, "pass/ID" personnel, canine handlers, commercial vehicle inspection teams, and detectives.  *Id*.  He testified that a detective was not a first responder, that there were already certain days and nights when there would be no detectives on a shift, and that detectives would typically respond to a crime scene once it was safe to conduct an investigation.  *Id*.

¶12    The NSN Commanding Officer, who was also the deciding official, indicated in an affidavit that the exception criterion at issue at the NSN was for those who protect the safety of life or property "to the extent needed," and that this meant that only "gun toting" police officers met that criterion.  IAF, Tab 8 at 114-15.  Thus, he understood that only classification series 0083 Police Officers and Supervisors met the criterion for exception from the furlough.  *Id*.

at 116. He also indicated that the only consideration in deciding whether to furlough an employee was "an employee's job title/position description and their ability to fully perform their duties." *Id*. at 119. The NSN Commanding Officer similarly testified that he interpreted the exception to apply to his first responders, which would be "gun toting" police officers, fire, and "EMS"[6] personnel. HCD 1. He testified that these individuals were first responders to safety or security emergencies who would arrive on the scene to protect the safety of life or property, and that he did not consider detectives to be first responders because they would not arrive first on the scene to protect life and property, but would arrive at a later time to investigate. *Id*. Thus, individuals met the exception at the NSN if they were first responders, to the extent they were needed to protect the safety of life and property. *Id*. The NSN Commanding Officer also testified that, although commanding officers at other bases in the region were operating under the same furlough guidelines, each base had its unique size, mission, and staff, such that other bases could have interpreted the guidelines differently. *Id*. Although he had discretion under those guidelines, he did not except the appellants from the furlough because he determined that the appellants were not first responders. *Id*.

¶13 The Deputy Regional Security Director indicated in an affidavit that the exception applied to civilians responsible for the safety of life or property, only to the extent needed to prevent unacceptable risk or catastrophic gaps, i.e., mostly police officers and firefighters. IAF, Tab 8 at 122, 126. Further, the Commander of the Navy Installation Command testified that detectives were not considered to be involved directly in the protection of life and property according to the NSN Installation Commander, that they are not first responders, and that this interpretation was based on which personnel were needed to protect the

---

[6] EMS is an abbreviation for Emergency Medical Services.

installation for the 1 day per week that the agency was planning to furlough its civilian employees.  HCD 1.

¶14     The administrative judge appropriately recognized that detectives, on occasion, perform first-responder-like duties, ID at 18, and there appears to be no dispute that detectives perform stakeouts, do undercover work, arrest suspects, testify in court, secure crime scenes, and take evidence from suspects and witnesses, HCD 1 (testimony of the Commander, Navy Installation Command, the NSN Commanding Officer, and the NSN Precinct Commander); HCD 2 (testimony of the NSN Deputy Precinct Commander and the appellant Greenfield).  These duties may be viewed as having some relation to the protection of life and property.  Nevertheless, based on the evidence set forth above and the Board's decision in *Lopez*, we find that the exception applied to those employees necessary to protect the safety of life and property, and only "to the extent necessary" to protect life and property.  The exception focused on round-the-clock emergency response requirements, and the agency sought to except from the furlough only those employees whose absence would present an unacceptable risk to the protection of life and property, which the NSN installation determined did not include detectives.  Although a position description indicates that police officers are first responders, IAF, Tab 9 at 51, the position description for detectives does not include such language, *id*. at 30-37.  The exception also provided installation commanders with the authority to apply the exception in such a way as to meet the needs of their particular installation.  Thus, we find that the agency has proven by preponderant evidence that the appellants, as detectives, were subject to, and did not meet the criteria for an exception to, the furlough.  We thus find that, even assuming that the detective position itself generally were to be considered a first responder position necessary to protect the safety of life and property, this did not create a blanket furlough exception for that position, and the agency has established that

detectives were not necessary to protect the safety of life and property at the NSN at the time of the furloughs in these cases. *See Lopez*, 121 M.S.P.R. 647, ¶ 11.

<u>The agency proved by preponderant evidence that the furlough promoted the efficiency of the service.</u>

¶15    The appellants assert that the agency did not conduct the furlough in a fair and even manner because it furloughed NSN detectives but did not furlough NSN police officers who were on light duty, limited duty, or in a disciplinary status, not eligible to carry a weapon or perform police work, and assigned to duties such as placing cones for traffic control; thus, they assert that these police officers did not meet the exception criteria, yet were excepted from the furlough. PFR File, Tab 1 at 4, 9-14.    In addition, the appellants contend that other detectives within the same competitive area at different installations were not furloughed, even though they were covered by the same collective bargaining agreement, fell under the same regional security director, and answered to the same furlough guidance from the Commander of the Navy Region, Mid-Atlantic. *Id*. at 13.    The appellants assert that a human resources specialist testified at the hearing that all detectives within the local commuting area for all seven Department of the Navy military installations would fall under a single competitive area.    *Id*. at 13-14.    The appellants contend that the administrative judge rejected this testimony and instead used organizational units as the competitive areas in question. *Id*. at 14.

¶16    The Board has held that, in light of the basic similarities between reductions in force (RIF) and adverse action furloughs, RIF principles are instructive in determining the scope of the Board's review of adverse action furloughs and what it means for a furlough of 30 days or less to be taken for the efficiency of the service. *Chandler v. Department of the Treasury*, 120 M.S.P.R. 163, ¶ 7 (2013).    Thus, an agency satisfies the efficiency of the service standard under 5 U.S.C. § 7513(a) in a furlough appeal by showing, in general, that the furlough was a reasonable management solution to the financial restrictions

placed on it and that the agency applied its determination as to which employees to furlough in a "fair and even manner." *Id.*, ¶ 8. A "fair and even manner" means that the agency applied the furlough uniformly and consistently, just as it is required to apply a RIF. *Id.* It also means that the agency is required to treat similar employees similarly and to justify any deviations with legitimate management reasons. *Id.*

¶17 Which employees are similarly situated for purposes of an adverse action furlough will be decided on a case-by-case basis, but the Board will be guided by RIF principles in making that determination, including RIF competitive level principles. *Id.*; *see Weathers v. Department of the Navy*, 121 M.S.P.R. 417, ¶ 6 (2014); 5 C.F.R. § 752.404(b)(2). In determining the retention standing of competing employees during a RIF, each agency shall establish competitive levels consisting of all positions in a competitive area which are in the same grade (or occupational level) and classification series, and which are similar enough in duties, qualification requirements, pay schedules, and working conditions so that an agency may reassign the incumbent of one position to any of the other positions in the level without undue interruption. *Weathers*, 121 M.S.P.R. 417, ¶ 8. Position descriptions are significant evidence in determining whether positions should be in the same competitive level, but other evidence also may be relevant under the circumstances if it sheds light on the position descriptions. *McKenna v. Department of the Navy*, 105 M.S.P.R. 373, ¶ 13 (2007); *see Jicha v. Department of the Navy*, 65 M.S.P.R. 73, 77 (1994) (finding that the competitive level in which an employee is placed is determined by the duties and qualifications required of the incumbent as set forth in the official position description). Generally, a competitive area must be defined solely in terms of the agency's organizational unit(s) and geographical location. *Weathers*, 121 M.S.P.R. 417, ¶ 8. The minimum competitive area is a subdivision of the agency under separate administration within the local commuting area. *Id.*

¶18     We first find that the appellants were not similarly situated to the police officers at the NSN.  In addition to the reasons set forth by the administrative judge as to why police officers and detectives were not similarly situated, ID at 16-19, the police officers at the NSN who were excepted from the furlough were in a different competitive level from the appellants because they occupied positions at different grade levels than the appellants, even if the positions were in the same classification series as detectives, IAF, Tab 8 at 82-85, Tab 10 at 19-21; *Burner v. Tennessee Valley Authority*, 20 M.S.P.R. 167, 169-71 (1984).  Most police officers at the NSN occupied GS-4 or GS-5 positions, compared with the appellants' GS-8 detective positions.  *E.g.*, IAF, Tab 8 at 82, Tab 10 at 19-20.

¶19     We note that several supervisory police officers (J.L., D.P., and M.S.) who were excepted from the furlough appear to have occupied GS-0083-8 positions like the appellants.  IAF, Tab 8 at 85, Tab 10 at 19-20.  The appellants do not allege that they were similarly situated to these supervisors.  PFR File, Tab 1 at 4, 6-7, 9, 11-13.  Nevertheless, we find that the supervisory police officer position was not similarly situated to the detective position.  For positions to occupy the same competitive level, anyone who qualifies for one position must be able to qualify for all.  *Disney v. Department of the Navy*, 67 M.S.P.R. 563, 568 (1995).  The nature of the positions, and not the qualifications of their incumbents, determines whether competitive levels are properly established.  *Coleman v. Department of Education*, 21 M.S.P.R. 574, 581 (1984).  The record does not include a supervisory police officer position description, but it does include a police officer position description, which likely provides some indication of the duties and responsibilities to be performed and/or supervised by a supervisory police officer.  The major duties and responsibilities of a police officer include providing "Anti-Terrorism/Force Protection," physical security, and law enforcement services, such as gate sentry, pier sentry, counter-surveillance duties, patrol of assigned areas, and operating specialized equipment designed to deter, detect, and defend against potential security breaches and terrorist activity.

IAF, Tab 9 at 39-45. A police officer is a "First Responder," and the position requires qualification with service weapons and passing an annual physical fitness test. *Id*. at 51.

¶20    By contrast, the major duties and responsibilities of the detective position are to conduct investigations of violations of laws, regulations, offenses, and crimes by maintaining surveillance over the scene or suspects, interrogating suspects and witnesses, searching the scene for physical evidence, taking and lifting fingerprints, comparing photographs of suspects with photographs on file, obtaining statements from witnesses, apprehending suspects, preparing reports, and testifying in court. *Id*. at 30-36. In this job, the detective must meet weapons qualifications and, from time to time, use force when making arrests or dealing with uncooperative personnel. *Id*. at 37. Testimony at the hearing from a former NSN Precinct Commander indicated that detectives received enhanced training on interviewing and fingerprinting and that police officers would not be as effective without the detectives in processing crime scenes and gathering evidence. HCD 1. Similarly, a lead watch commander testified that the duties of detectives are expanded because they process crime scenes, issue warrants, and interview and interrogate suspects, witnesses, and victims. HCD 2. The appellant Greenfield testified that he received training that police officers do not receive, including in such areas as writing analysis, i.e., determining whether individuals were being truthful in their written statements, processing crime scenes, and footprint analysis. *Id*. He testified that the most a police officer can do is take a report, while a detective interviews individuals and develops an investigation that can lead to an arrest. *Id*. According to the position description, there are no regular supervisory duties or responsibilities, nor are detectives "First Responders." IAF, Tab 9 at 30-37.

¶21    The inclusion of positions in the same classification series does not require an agency to place them in the same competitive level. *George v. Interstate Commerce Commission*, 20 M.S.P.R. 479, 482, *aff'd*, 758 F.2d 667

(Fed. Cir. 1984) (Table). We find that the positions of supervisory police officer and detective are not similar enough in duties, qualification requirements, pay schedules, and working conditions so that an agency may reassign the incumbent of one position to the other position without undue interruption. Thus, they belong in separate competitive levels and are not similarly situated for purposes of an adverse action furlough. *See Estrin v. Social Security Administration*, 24 M.S.P.R. 303, 306-07 (1984) (excluding from the appellant's competitive level positions that differed significantly from the appellant's position in the necessary skills, duties, and knowledge, including supervisory responsibility); *cf. Conway v. Department of the Navy*, 71 M.S.P.R. 502, 508 (1996) (noting that an agency is permitted to establish separate competitive levels for positions with the same grade and title to take into account special qualifications or duties required of some incumbents).

¶22    Moreover, we agree with the administrative judge that the detectives located at other installations are not similarly situated to the appellants. Although they may have occupied the same positions at the same grade level, the administrative judge correctly found that they were not similarly situated to the appellants because they worked in different organizational units under separate administrations. ID at 17; *see Rodgers v. Department of the Navy*, 122 M.S.P.R. 559, ¶¶ 2, 15 (2015) (holding that an Attorney Advisor at the Navy Munitions Command in Yorktown, Virginia, who was furloughed, was not similarly situated to attorneys in the same classification series assigned to the Norfolk Naval Shipyard in Portsmouth, Virginia, for purposes of a furlough, even if they performed similar duties, because the shipyard attorneys worked in a different subdivision of the agency under separate administration, and thus were not in the appellant's competitive area); *Weathers*, 121 M.S.P.R. 417, ¶ 9 (finding that the agency was permitted to treat different organizational units as separate competitive areas and treat employees from those competitive areas differently because they were not similarly situated); *see also Bashein v. United States*,

279 F.2d 255, 257-58 (Ct. Cl. 1960) (finding separate competitive areas for RIF purposes when the New York Naval Shipyard and a Naval Supply Depot were, despite being "close neighbors," under separate commands with separate retention registers).

¶23        Although a human resources specialist familiar with RIFs testified that, for RIF purposes, detectives at the NSN were in the same competitive area as detectives at the Oceana, Little Creek, and Norfolk Naval Shipyard installations, she also testified that this definition of competitive area would be used by the agency only in the case of a RIF or a furlough that lasted for more than 22 days. HCD 2.  A different human resources specialist who was involved in the 2013 furlough testified that the competitive area for detectives at the NSN during the furlough was the fence line of the installation for which the commanding officer had responsibility, and that each commanding officer had the authority to make furlough decisions based on the needs of that installation.  *Id*.  This testimony is consistent with the uncontradicted testimony and affidavits of numerous agency officials that the decisions on exceptions to the furlough were installation-specific, given that each base had different requirements and a unique size, mission, and staff composition, and therefore each installation's commanding officer was given the flexibility to make different decisions on whether furloughing detectives would have led to an unacceptable degree of risk. HCD 1; *see* IAF, Tab 8 at 100-01, 107, 114, 122, 126-27.  In sum, we agree with the administrative judge that the detectives located at other installations were not similarly situated to the appellants because they worked in different organizational units under separate administrations.

¶24        We thus find that the actions promoted the efficiency of the service because the furlough was a reasonable management solution to the financial restriction placed on the agency, and the agency treated similar employees similarly and applied the furlough uniformly and consistently.

We remain the appellants' discrimination claims for further adjudication.

¶25     The appellants contend on review that the agency discriminated against them based on race because it furloughed Black, but not White, detectives within the same competitive area for RIF purposes.  PFR File, Tab 1 at 4-5, 10, 15-17; *Gaston v. Department of the Navy*, MSPB Docket No. DC-0752-14-0532-I-1, Petition for Review File (Gaston PFR), Tab 1 at 15-17.  The appellants assert that all Black detectives within the Mid-Atlantic Region were furloughed, while all White detectives were not furloughed.  PFR File, Tab 1 at 16.  They contend that they were similarly situated to the White detectives at other installations because they all performed the same duties (although they claim the Black detectives at the NSN had a greater case load), fell under the same position description and collective bargaining agreement, fell under the same regional security director, and fell within the same competitive area.  *Id*.  They further assert that all detectives within the Mid-Atlantic Region were evaluated under the same DOD exception—direct responsibility to protect the safety of life and property—and that the agency's only explanation for the difference in treatment was that the NSN Security Officer did not interpret the exception as did the responsible officials at the other installations.  *Id*.

¶26     The appellants also contend that, although the administrative judge found no evidence that the Security Officer influenced the NSN Commanding Officer, who was the deciding official, the administrative judge improperly failed to apply the Board-recognized "cat's paw" theory under which a management official, acting because of an improper animus, can influence an agency official who is unaware of the improper animus when implementing a personnel action.  *Id*. at 16-17.  The appellants assert that the Security Officer, who made several racist statements, influenced the ultimate decision to furlough the appellants because he decided to change the status of the detectives at the NSN from excepted to nonexcepted.  *Id*. at 17.

¶27    In addressing the appellants' discrimination claims, the administrative judge applied the then-applicable Board case law holding that, once an appellant establishes a prima facie case of discrimination, the burden shifts to the agency to articulate a legitimate nondiscriminatory reason for its action; once the agency has articulated a legitimate nondiscriminatory reason for its action, the burden shifts back to the appellant to show that the agency's proffered explanation constitutes a pretext for discrimination.  ID at 6-7, 17-20; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  After the issuance of the initial decisions, however, the Board issued its decision in *Savage v. Department of the Army*, 122 M.S.P.R. 612, ¶ 46 (2015), which clarified the evidentiary standards and burdens of proof under which the Board analyzes discrimination claims and held that the summary judgment standards for title VII cases, which incorporate the burden-shifting framework of *McDonnell Douglas*, do not apply to Board appeals.

¶28    The Board held in *Savage* that, when an appellant asserts an affirmative defense of discrimination or retaliation under 42 U.S.C. § 2000e-16, the Board first will inquire whether the appellant has shown by preponderant evidence that the prohibited consideration was a motivating factor in the contested personnel action.  122 M.S.P.R. 612, ¶ 51.  Such a showing is sufficient to establish that the agency violated 42 U.S.C. § 2000e-16, thereby committing a prohibited personnel practice under 5 U.S.C. § 2302(b)(1).  *Savage*, 122 M.S.P.R. 612, ¶ 51.  In making an initial showing, an appellant may rely on direct evidence or any of the three types of circumstantial evidence described in *Troupe v. May Department Stores Company*, 20 F.3d 734, 736-37 (7th Cir. 1994), either alone or in combination.  *Savage*, 122 M.S.P.R. 612, ¶ 51.  Those three types of circumstantial evidence are (1) a "convincing mosaic" of discrimination, i.e., suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group at issue, and "other bits and pieces from which an inference of discriminatory intent might be drawn,"

(2) comparator evidence, and (3) evidence that the agency's stated reason for its action is unworthy of belief, such that it is a mere pretext for discrimination. *Savage*, 122 M.S.P.R. 612, ¶ 42 (quoting *Troupe*, 20 F.3d at 736-37). If the appellant meets her burden, the Board then will inquire whether the agency has shown by preponderant evidence that the action was not based on the prohibited personnel practice, i.e., that it still would have taken the contested action in the absence of the discriminatory or retaliatory motive. *Id.*, ¶ 51. If the Board finds that the agency has made that showing, its violation of 42 U.S.C. § 2000e-16 will not require reversal of the action. *Id.*

¶29        Although the standard applied by the administrative judge may have been proper at the time of the initial decision, the Board will apply the law in effect when a petition for review is pending before the Board, which in this case includes the decision in *Savage*. *See, e.g.*, *Doran v. Department of the Treasury*, 115 M.S.P.R. 604, ¶ 10 (2011). Here, the appellants were not placed on notice of the evidentiary standards and burdens of proof for proving their discrimination claims as set forth in *Savage*. Gaston IAF, Tab 7 at 2-4; *see Milner v. Department of Justice*, 77 M.S.P.R. 37, 46 (1997) (finding that an appellant did not receive a fair and just adjudication of an affirmative defense when there was no indication that the administrative judge apprised him of the applicable burdens of proof or of the types of evidence required to meet his burden).

¶30        In addition, the administrative judge held that, although the Security Officer[7] used certain "offensive, despicable, and racist language," there was insufficient evidence to establish that he influenced the deciding official.

---

[7] Although the administrative judge found that the Security Officer was the proposing official, ID at 9, 18, the proposal notice indicates that the proposing official was a different individual and that requests to arrange for an oral reply or to review supporting materials could be made to the Security Officer, *e.g.*, IAF, Tab 6 at 38-40. On remand, the administrative judge shall clarify the nature of the role of the Security Officer as it related to the furlough of the appellants in these cases.

ID at 18. The Board has held, however, that an individual's role in the decision-making process that leads to an adverse action cannot be ignored in considering a claim of discrimination and may taint the process. *See Jones v. Department of the Army*, 75 M.S.P.R. 115, 119-21 (1997); *Johnson v. Defense Logistics Agency*, 61 M.S.P.R. 601, 608 (1994). Moreover, in determining whether the appellants were similarly situated to the detectives outside their protected class who were not furloughed, the administrative judge should consider whether the Board's decision in *Deas v. Department of Transportation*, 108 M.S.P.R. 637 (2008), applies in this case.[8] In *Deas*, 108 M.S.P.R. 637, ¶ 21, the Board held that, although comparators generally must be in the same work unit as the appellant in order to be considered similarly situated for purposes of a discrimination claim, employees outside an appellant's work unit may be similarly situated when the evidence establishes that a central office is responsible for the review and coordination of adverse actions against employees of different work units and the officials who execute the notices do not exercise a sufficient degree of autonomy in determining the actions to be taken against the employees.[9]

---

[8] In *Abbott v. U.S. Postal Service*, 121 M.S.P.R. 294, ¶¶ 9-10 (2014), the Board overruled decisions in which it applied the jurisdictional framework for "constructive" suspensions to cases involving the placement of an employee on enforced leave for more than 14 days, finding instead that those cases constitute appealable suspensions within the Board's jurisdiction. The Board in *Deas*, 108 M.S.P.R. 637, ¶ 12, had cited to several cases for the principle that an agency's placement of an employee on enforced leave is a "constructive" suspension. The principle for which we cite to *Deas* in this Opinion and Order has not, however, been overruled.

[9] In a declaration made under penalty of perjury, the deciding official averred that all positions at the NSN meeting the protection of life and property exception were identified and submitted through the Commander, Navy Region Mid-Atlantic, and the Commander, Navy Installations Command, and approved by the Assistant Secretary of the Navy (Manpower and Reserve Affairs) via the Director, Office of Civilian Human Resources. CAF, Tab 5 at 6. He further averred that, while the exceptions based on the protection of life and property were submitted through higher level command, he made an independent assessment of the security needs of the NSN and determined which

¶31     Under these circumstances, and because adjudicating these discrimination claims may involve resolving conflicting evidence and credibility issues that could depend upon the demeanor of witnesses, it is appropriate to remand these cases for further adjudication. *See Durr v. Department of Veterans Affairs*, 119 M.S.P.R. 195, ¶ 15 (2013); *Garrison v. Department of the Navy*, 88 M.S.P.R. 389, ¶ 10 (2001); *see also Farquhar v. Department of the Air Force*, 82 M.S.P.R. 454, ¶¶ 8, 13 (1999) (affirming findings on the merits of a reduction–in-force action, but remanding for adjudication of the appellant's discrimination claim); *Thompson v. Department of the Navy*, 80 M.S.P.R. 245, ¶¶ 5-7 (1998) (same). On remand, the administrative judge should inform the parties of the standards of proof applicable to a claim of discrimination pursuant to *Savage*, and provide them with an opportunity to further develop the evidence on the discrimination issue. The administrative judge's new decision should incorporate the above findings on the merits of the furlough and the *Savage* standard for analyzing the appellants' discrimination claims, as well as the Board's decisions in *Jones*, *Johnson*, and *Deas*.[10]

---

positions were required for the protection of life and property. *Id*. He determined that detective positions would not be excepted from the furlough mainly because he believed that furloughing detectives at the NSN would not lead to an unacceptable risk or catastrophic gaps in the safety and protection of life or property at the installation. *Id*.

[10] The appellant Gaston does not challenge the administrative judge's findings on her sex discrimination claim. Gaston PFR File, Tab 1 at 10, 15-17. In any event, we find that applying the analytical framework in *Savage* to the appellant Gaston's sex discrimination claim would not change the result in this case.

## ORDER

¶32    Accordingly, we find that the appellants were subject to, and not excepted from, the furlough, affirm the initial decisions' finding that the agency proved that the furlough promoted the efficiency of the service, vacate the initial decisions' findings regarding the race discrimination claims, and remand these appeals for further adjudication consistent with this Opinion and Order.


FOR THE BOARD:


_____
William D. Spencer
Clerk of the Board
Washington, D.C.